## STEELCASE, INC. *v.* ALLAN A. CRYSTAL, COMMISSIONER OF REVENUE SERVICES (15187)

Peters, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued November 30, 1995—officially released August 6, 1996

*Jonathon L. Ensign,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant (defendant).

*Richard W. Tomeo*, with whom were *John R. Shaugh-nessy, Jr.*, and, on the brief, *Paul T. Sorensen* and *George C. Hastings*, for the appellee (plaintiff).

NORCOTT, J. The issue in this tax appeal is whether the trial court properly determined that the taxpayer, an out-of-state manufacturer, is not liable for sales tax; see General Statutes § 12-408;[1] with respect to its sales

[1] General Statutes § 12-408 provides in relevant part: "The sales tax. (1) Imposition and rate of sales tax. For the privilege of making any sales as defined in subsection (2) of section 12-407, at retail, in this state for a consideration, a tax is hereby imposed on all retailers at the rate of six per cent of the gross receipts of any retailer from the sale of all tangible personal property sold at retail or from the rendering of any services constituting a sale in accordance with subsection (2) of section 12-407 . . . .

"(2) Retailer collects tax from consumer. Credit allowed for tax remitted to state on worthless account receivable. Reimbursement for the tax hereby imposed shall be collected by the retailer from the consumer and such tax reimbursement, termed "tax" in this and the following subsections, shall be paid by the consumer to the retailer and each retailer shall collect from the consumer the full amount of the tax imposed by this chapter or an amount equal as nearly as possible or practicable to the average equivalent thereof. Such tax shall be a debt from the consumer to the retailer, when so added to the original sales price, and shall be recoverable at law in the same manner as other debts except as provided in section 12-432a. The amount of tax reimbursement, when so collected, shall be deemed to be a special fund in trust for the state of Connecticut. Whenever such tax, payable by the consumer (A) with respect to a charge account or credit sale occurring on or after July 1, 1984, is remitted by the retailer to the commissioner and such sale as an account receivable is determined to be worthless and is actually written off as uncollectible for federal income tax purposes or (B) to a retailer who computes taxable income, for purposes of taxation under the Internal Revenue Code of 1986, or any subsequent corresponding internal revenue code of the United States, as from time to time amended, on the cash basis method of accounting with respect to a sale occurring on or after July 1, 1989, is remitted by the retailer to the commissioner and such sale as an account receivable is determined to be worthless, the amount of such tax remitted may be credited against the tax due on the sales tax return filed by the retailer for the monthly or quarterly period, whichever is applicable, next following the period in which such amount is actually so written off, but in no event shall such credit be allowed later than three years following the date such tax is remitted. The commissioner shall, by regulations adopted in accordance with chapter 54, provide standards for proving any such claim for credit. If any account with respect to which such credit is allowed is thereafter collected by the retailer in whole or in part, the

of its products to out-of-state retailers from whom it accepted resale certificates, and for whom it sent its products directly from its out-of-state warehouse to the retailers' customers in Connecticut. The plaintiff taxpayer, Steelcase, Inc. (Steelcase), appealed to the Superior Court from a sales and use tax assessment, including interest and penalty, imposed by the defendant, Allan A. Crystal, the commissioner of revenue services (commissioner). The trial court sustained Steelcase's appeal and reduced the assessment to zero. The commissioner appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The relevant facts have been stipulated. Steelcase is a manufacturer of office furniture and systems with its principal place of business in Grand Rapids, Michigan. During the tax period at issue in this case, Steelcase was registered with the Connecticut department of revenue services as a retailer subject to sales tax. During this period, Steelcase, as a general business practice, sold its products to independent office furniture retailers located in various states. The retailers were obligated to Steelcase for payment of the wholesale price of the goods purchased, regardless of whether the retailers received payment for such goods from the retailers' own customers or the amount of such payment from the retailers' customers. The retailers sought customers' orders and determined whether to accept an order or to extend credit to a customer. The retailers' customers were not liable to Steelcase for goods sold to them by the retailers. Steelcase delivered products purchased

amount so collected shall be included in the sales tax return covering the period in which such collection occurs. The tax applicable in any such case shall be determined in accordance with the rate of sales tax in effect at the time of the original sale. . . ."

by retailers to common carriers at its manufacturing or warehouse facilities, all of which were located outside Connecticut. Under Steelcase's terms and conditions of sale, which were accepted by retailers when they ordered goods from Steelcase, title to the products passed to a retailer-purchaser when shipment was accepted for transportation by a common carrier at a Steelcase distribution point.

In the five transactions at issue in this case, Steelcase sold its products to independent retailers, who were not located or registered in Connecticut. The retailers certified to Steelcase that the sales were sales for resale and Steelcase, in good faith, took from each retailer a resale certificate in a form acceptable to its respective state. The retailers in turn sold the products to their own customers. In each of the transactions at issue, the retailer directed Steelcase to send the products it had purchased from Steelcase directly to the retailer's customer at a Connecticut location. The goods were shipped by an independent common carrier hired by Steelcase, who picked up the goods at the shipping point located outside Connecticut. The vehicles in which the goods were shipped were neither owned nor leased by Steelcase. In each transaction, under Steelcase's terms and conditions of sale the goods were shipped "F.O.B. factory," and title to the goods passed from Steelcase to the retailer upon delivery to the carrier at Steelcase's shipping point outside Connecticut. The retailers were responsible for making all necessary arrangements for unloading the goods from the common carrier at the customers' Connecticut locations; Steelcase made no such arrangements.

Steelcase was not a party to the sales contracts between the retailers and their customers. The customers made no payment to Steelcase and it did not know what amounts were owed by the customers to the retailers, or whether any payments were made by the custom-

ers to the retailers. Further, Steelcase did not know whether the customers had paid sales tax to the retailers, whether the customers had self-assessed a use tax, or whether the customers were exempt from the Connecticut sales and use tax.

The commissioner conducted a sales and use tax audit of Steelcase for the period from February, 1988, through January, 1991. In December, 1991, the commissioner issued to Steelcase a sales and use tax assessment in connection with the five transactions. The commissioner maintained that Steelcase, by sending its product to the retailers' customers at Connecticut locations, had made retail sales in this state under General Statutes § 12-407 (3).[2] The commissioner based the amount of the assessment on the price charged by Steelcase to the retailer, rather than on the retail price paid by the customer to the retailer.[3] Steelcase petitioned for reassessment, which petition the commissioner denied.

Steelcase appealed from the commissioner's denial of its petition for reassessment to the trial court pursuant to General Statutes § 12-422.[4] The trial court sus-

---

[2] General Statutes § 12-407 (3) provides: " 'Retail sale' or 'sale at retail' means and includes a sale for any purpose other than resale in the regular course of business of tangible personal property or a transfer for a consideration of the occupancy of any room or rooms in a hotel or lodging house for a period of thirty consecutive calendar days or less, or the rendering of any service described in any of the subdivisions of subsection (2) of this section. The delivery in this state of tangible personal property by an owner or former owner thereof or by a factor, if the delivery is to a consumer pursuant to a retail sale made by a retailer not engaged in business in this state, is a retail sale in this state by the person making the delivery. He shall include the retail selling price of the property in his gross receipts."

[3] The commissioner assessed Steelcase $12,465.64 in tax, $7189.10 in interest, and $469.35 in penalty.

[4] General Statutes § 12-422 provides in relevant part: "Appeal. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal there-

tained the appeal, reasoning that § 12-407 (3) must be interpreted to exclude sales for resale and that, because the commissioner had failed to establish that Steelcase's sales to the retailers were not sales for resale, Steelcase had not made retail sales within the meaning of § 12-407 (3) and, therefore, was not liable for the tax assessed by the commissioner.

On appeal, the commissioner claims that the trial court improperly determined that Steelcase had not, in connection with the five transactions, made retail sales in Connecticut. Focusing on the second sentence of § 12-407 (3); see footnote 2; the commissioner argues that, although the sales by Steelcase to the retailers constituted sales for resale, Steelcase "delivered" the products in Connecticut within the meaning of § 12-407 (3) and that its delivery of the products constituted retail sales.

Steelcase argues that the trial court properly determined that § 12-407 (3) must be read as a whole to exclude sales for resale and that, because the commissioner did not demonstrate that Steelcase's sales to the retailers in the five transactions at issue were not for resale, it was not subject to sales tax in connection with those transactions. Alternatively, Steelcase argues that it did not deliver the products in Connecticut within the meaning of § 12-407 (3) and, consequently, that no tax is due under the commissioner's theory of liability. We agree with Steelcase that it did not deliver its products in Connecticut under § 12-407 (3) and, therefore, that the trial court properly sustained the appeal.[5]

from to the superior court for the judicial district of Hartford-New Britain . . . ."

[5] Steelcase also claims, alternatively, that the imposition of tax on it in connection with these transactions violates the commerce clause of the United States constitution. Because we conclude that Steelcase is not statutorily subject to tax in connection with these transactions, we do not reach this constitutional claim. See *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986) ("court has a basic judicial duty to avoid deciding a constitu-

"The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"In this case, the trial court's determinations were based on a record that consisted solely of a stipulation of facts, written briefs, and oral arguments by counsel. The trial court had no occasion to evaluate the credibility of witnesses or to assess the intent of the parties in light of additional evidence first presented at trial. The record before the trial court was, therefore, identical with the record before this court. In these circumstances, the legal inferences properly to be drawn from the parties' definitive stipulation of facts raise questions of law rather than of fact. . . . Accordingly, our review of the ruling of the trial court in this case is plenary." (Citations omitted.) *Morton Buildings, Inc.* v. *Bannon*, 222 Conn. 49, 53–54, 607 A.2d 424 (1992).

Resolution of this appeal requires us to interpret certain provisions of the Sales and Use Taxes Act (act), General Statutes § 12-406 et seq. "In construing any statute, we seek to ascertain and give effect to the apparent intent of the legislature. *Texaco Refining & Marketing Co.* v. *Commissioner*, 202 Conn. 583, 589, 522 A.2d 771 (1987). In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and com-

tional issue if a nonconstitutional ground exists that will dispose of the case").

mon law principles governing the same general subject matter." (Internal quotation marks omitted.) *United Illuminating Co.* v. *Groppo,* 220 Conn. 749, 755–56, 601 A.2d 1005 (1992). Further, "[w]e review the trial court's ruling from the premise that, when the issue is the imposition of a tax, rather than a claimed right to an exemption or a deduction, the governing authorities must be strictly construed against the commissioner and in favor of the taxpayer." *Hartford Parkview Associates Ltd. Partnership* v. *Groppo,* 211 Conn. 246, 249–50, 558 A.2d 993 (1989); see also *Morton Buildings, Inc.* v. *Bannon,* supra, 222 Conn. 54 (same).

"The Sales and Use Tax[es] Act imposes both taxes and places their ultimate burden on the purchaser." *Hartford Parkview Associates Ltd. Partnership* v. *Groppo,* supra, 211 Conn. 254. "The two taxes 'are [however] different in conception, are assessments upon different transactions, and in the interlacings of the two legislative authorities within our federation may have to justify themselves on different constitutional grounds. A sales tax is a tax on the freedom of purchase . . . . A use tax is a tax on the enjoyment of that which was purchased. *McLeod* v. *Dilworth Co.,* 322 U.S. 327, 330, 64 S. Ct. 1023, 88 L. Ed. 1304 [1944].' " *Morton Buildings, Inc.* v. *Bannon,* supra, 222 Conn. 58–59. "[G]enerally a sales tax is imposed on items acquired within the state and a use tax is imposed on items acquired outside the state for use within this state. . . . Concededly, the department of revenue services cannot collect both a sales and a use tax on the same transaction." (Citations omitted; internal quotation marks omitted.) *Hartford Parkview Associates Ltd. Partnership* v. *Groppo,* supra, 254–55.

Section 12-408 imposes a tax on retailers[6] "[f]or the privilege of making any sales as defined in subsection

---

[6] General Statutes § 12-407 (12) defines "retailer" to include: "(a) Every person engaged in the business of making sales at retail or in the business

(2) of section 12-407,[7] at retail, in this state for a consideration . . . ." The commissioner has consistently relied on § 12-407 (3), which defines retail sale, as the basis for his imposition of tax on Steelcase in connection with the five transactions at issue. Under § 12-407

of making retail sales at auction of tangible personal property owned by the person or others; (b) every person engaged in the business of making sales for storage, use or other consumption or in the business of making sales at auction of tangible personal property owned by the person or others for storage, use or other consumption; (c) every operator as defined in subsection (18) of this section; (d) every seller rendering any service described in subdivision (i) of subsection (2) of this section; (e) every person under whom any salesman, representative, peddler or canvasser operates in this state, or from whom such salesman, representative, peddler or canvasser obtains the tangible personal property that is sold; (f) every person with whose assistance any seller is enabled to solicit orders within this state; (g) every person making retail sales from outside this state to a destination within this state and not maintaining a place of business in this state who engages in regular or systematic solicitation of sales of tangible personal property in this state (A) by the display of advertisements on billboards or other outdoor advertising in this state, (B) by the distribution of catalogs, periodicals, advertising flyers or other advertising by means of print, radio or television media or (C) by mail, telegraphy, telephone, computer data base, cable, optic, microwave or other communication system, for the purpose of effecting retail sales of tangible personal property, provided such person has made one hundred or more retail sales from outside this state to destinations within this state during the twelve-month period ended on the September thirtieth immediately preceding the monthly or quarterly period with respect to which such person's liability for tax under this chapter is determined; (h) any person owned or controlled, either directly or indirectly, by a retailer engaged in business in this state which is the same as or similar to the line of business in which such person so owned or controlled is engaged; (i) any person owned or controlled, either directly or indirectly, by the same interests that own or control, either directly or indirectly, a retailer engaged in business in this state which is the same as or similar to the line of business in which such person so owned or controlled is engaged; (j) any assignee of a person engaged in the business of leasing tangible personal property to others, where leased property of such person which is subject to taxation under this chapter is situated within this state and such assignee has a security interest, as defined in subsection (37) of section 42a-1-201, in such property."

[7] General Statutes § 12-407 (2) provides in relevant part: " 'Sale' and 'selling' mean and include: (a) Any transfer of title, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration; (b) any withdrawal, except a with-

(3), " '[r]etail sale' or 'sale at retail' means and includes a sale for any purpose other than resale in the regular course of business of tangible personal property . . . . The delivery in this state of tangible personal property by an owner or former owner thereof or by a factor, if the delivery is to a consumer pursuant to a retail sale made by a retailer not engaged in business in this state, is a retail sale in this state by the person making the delivery. He shall include the retail selling price of the property in his gross receipts." The parties agree, and we agree, that whether Steelcase made retail sales in connection with the five transactions is determinative of the validity of the commissioner's assessment under the act.

In a written memorandum of decision, the trial court determined that the commissioner's assessment was not valid. The trial court agreed that whether the assessment was proper turned on whether Steelcase had made retail sales pursuant to § 12-407 (3) in connection with the five transactions. As the trial court noted, there are few published decisions addressing the liability of a manufacturer or wholesaler for sales or use tax in connection with transactions such as these, known as drop shipment transactions. See Black's Law Dictionary (6th Ed. 1990). Tax courts in both New York and New Jersey have rejected the imposition of sales or use tax by the taxing authority on a manufacturer who sold products to a retailer located outside of the taxing state but who sent the products directly to the retailer's customer in the taxing state. See *Steelcase, Inc.* v. *Director of Division of Taxation,* 13 N.J. Tax. 182 (1993); *Solo Cup Co.* v. *Director of Division of Taxation,* N.J. Tax Court,

drawal pursuant to a transaction in foreign or interstate commerce, of tangible personal property from the place where it is located for delivery to a point in this state for the purpose of the transfer of title, exchange or barter, conditional or otherwise, in any manner or by any means whatsoever, of the property for a consideration . . . ."

Docket No. 07-14-1301-91ST, 1993 N.J. Tax LEXIS 13 (April 5, 1993); *In the Matter of the Petition of Steelcase, Inc.*, N.Y. Tax Commission, Docket No. TSB-H-87 (219) S, 1988 N.Y. Tax LEXIS 327 (July 3, 1988). The relevant taxing statutes of both New York and New Jersey, however, define retail sale simply as a sale other than for resale.[8]

Noting that the first sentence of § 12-407 (3) provides that a retail sale includes a sale for any purpose other than resale, which limitation is not repeated in the second sentence of the definition, the trial court determined that "[t]he relationship between the first and second sentences of § 12-407 (3) poses a problem that lies at the heart of this case." Relying on General Statutes § 12-410, which provides that gross receipts are presumed to be subject to the retail sales tax unless the person who made the sale took from the purchaser a certificate to the effect that the property is purchased for resale, and the general principle that sales for resale are exempt from sales and use tax, the trial court concluded that "[i]f the sales and use tax law of Connecticut is to be coherent and consistent, the entire definition of 'retail sale' set forth in § 12-407 (3) must be read as excluding sales for resale." The court further noted that "[t]his specifically means that the second sentence of § 12-407 (3) implicitly contains such an exemption." In light of this interpretation, the trial court considered "the pivotal question in this case [to be] whether the sales at issue here were bona fide sales for resale."

The trial court reasoned that, under § 12-410, if Steelcase demonstrated that it had taken a certificate

---

[8] In New Jersey, retail sale is defined as "[a] sale of tangible personal property to any person for any purpose, other than (A) for resale . . . ." N.J. Stat. Ann. 54:32B-2 (e) (1) (West 1986). In New York, retail sale is defined as "[a] sale of tangible personal property to any person for any purpose, other than (A) for resale as such or as a physical component part of tangible personal property . . . ." N.Y. Tax Law § 1101 (b) (4) (i) (McKinney 1987).

of resale from the purchaser-retailer in each of the five transactions, the burden to show that the sales were not sales for resale shifted to the commissioner. Relying on the stipulation that Steelcase had in good faith accepted certificates of resale from the retailers, which certificates were acceptable in the retailers' respective states, the court determined that the commissioner bore the burden of demonstrating that those sales were not for resale and further determined that it had not met that burden. Accordingly, the trial court did not reach the issue of whether Steelcase had delivered the products in this state within the meaning of the second sentence of § 12-407 (3).

On appeal, the commissioner concedes that the trial court properly determined that sales for resale generally are exempt from sales tax under the act. The commissioner further concedes that Steelcase's sales of its products to the retailers in the five transactions were sales for resale and were, therefore, exempt from Connecticut sales tax. He contends, however, that the contested assessment was not imposed on the sales by Steelcase to the retailers. In this regard, he acknowledges that in the five transactions there were actually two sales as that term is ordinarily used: (1) the sale of the products by Steelcase to the retailers; and (2) the sale of the products by the retailers to the consumers. The commissioner maintains that what is at issue is the "third leg" of these "triangular" transactions, namely, the delivery of the products to the consumer in Connecticut. The commissioner argues that the second sentence of § 12-407 (3) operates to render the delivery of the products to the consumer directly from Steelcase's plant a retail sale and thereby to place on Steelcase, as an owner or former owner of the products sold, "the sales and use tax collection obligation."[9]

---

[9] Although the commissioner suggests on appeal that what is at issue is Steelcase's liability, in connection with the five drop shipment transactions,

Although we agree with the trial court that, as a general matter, the act exempts from sales tax liability sales made for resale; see *White Oak Corp.* v. *Dept. of Revenue Services*, 198 Conn. 413, 418, 503 A.2d 582 (1986); we also agree with the commissioner that that determination is not dispositive of the issue presented by Steelcase's appeal from the commissioner's assessment. The second sentence of § 12-407 (3) clearly contemplates imposition of tax liability on a party other than the actual retailer and, by deeming a former owner who delivers the property to be the party making the retail sale for tax purposes, the act also contemplates the imposition of tax liability on a party, such as a manufacturer or wholesaler, who sells the property to the retailer for resale. Thus we must address the question whether, notwithstanding that it made sales for resale to the out-of-state retailers, Steelcase is nevertheless liable under the act for sales tax in connection with the five transactions because it also "delivered" the products in the manner set forth in the second sentence of § 12-407 (3).

It is undisputed that, when the transactions at issue took place, Steelcase was an owner or former owner of the tangible personal property involved. Further, it is undisputed that the property was sold to consumers by retailers who were not registered in Connecticut. Thus, in order to determine whether Steelcase's actions in connection with those transactions constituted retail sales within the meaning of § 12-407 (3) and, therefore, whether Steelcase was liable for the contested assess-

for sales *and/or* use tax, it has been stipulated that the contested assessment imposed sales tax, and the question expressly resolved by the trial court was the validity of the commissioner's imposition of sales tax. We need not decide, however, whether the assessment is proper as a use tax as opposed to a sales tax, because, in either case, liability under the commissioner's theory turns on whether Steelcase made retail sales in Connecticut within the meaning of § 12-407 (3), which we conclude it did not.

ment, we must determine whether Steelcase "delivered" its products "in this state."

The term "deliver" is not defined in the act and the legislative history of the act does not inform its meaning. The commissioner argues that the term "deliver" means to transfer possession of goods, and that delivery takes place in this state whenever an owner, former owner or factor causes goods to be transported, by means of a common carrier or its own vehicles, directly to a consumer who takes actual possession of the goods in Connecticut. Steelcase urges us, in construing the term "deliver," to look to principles of commercial law as reflected in the Uniform Commercial Code (UCC), General Statutes § 42a-1-101 et seq.; the Sales Act, General Statutes (1930 Rev.) § 4622 et seq.; and caselaw. Steelcase argues that according to those principles, delivery is presumptively effected by the actual or constructive transfer of possession of goods at the place agreed upon by the parties, which, it contends, in this case was Michigan. We agree with Steelcase.

"A long-standing rule of statutory construction is that if a statute makes use of words [that] have an accepted meaning at the common law they ought, in the absence of other controlling reasons, to be expounded and received with that meaning." (Internal quotation marks omitted.) *Red Rooster Construction Co.* v. *River Associates, Inc.*, 224 Conn. 563, 570, 620 A.2d 118 (1993). When the Sales and Use Taxes Act was enacted, the Sales Act defined delivery as the "voluntary transfer of possession from one person to another." General Statutes (1930 Rev.) § 4691. Both the Sales Act and the UCC contemplate delivery by actual or constructive transfer of possession, according to the intent of the parties. Cf. Black's Law Dictionary (6th Ed. 1990) (defining "delivery" as "[t]he act by which the res or substance thereof is placed within the actual or constructive possession or control of another"). Further, if the contract of the

parties does not establish the place of delivery, the UCC provides, as did the Sales Act, certain "default" rules to determine the place of delivery. In this regard, the UCC provides that "[u]nless otherwise agreed . . . the place for delivery of goods is the seller's place of business or if he has none his residence . . . ." General Statutes § 42a-2-308. Similarly, the Sales Act provided that "[w]hether it is for the buyer to take possession of the goods or for the seller to send them to the buyer is a question depending in each case on the contract, express or implied, between the parties. Apart from any such contract, express or implied, or usage of trade to the contrary, the place of delivery is the seller's place of business . . . ." General Statutes (1930 Rev.) § 4663.

Moreover, there are also settled meanings for certain delivery terms used in contracts for the sales of goods. "The contract of the parties may be wholly silent on the place for delivery. Section 2-308 generally fills this gap with the seller's place of business as the place for delivery. Often, however, the gap will only be partial. In an important class of cases, the contract will either require or authorize the seller to ship the goods, but will not require the seller to deliver them at a particular destination. The most common of these contracts are those which include the symbols 'F.O.B. seller's plant' or 'F.O.B. seller's city.' The place of delivery in such contracts (and those that include equivalent language) is the place where the facilities of the seller's carrier are located, for the seller must 'put the goods into the possession of the carrier.' " 1 J. White & R. Summers, Uniform Commercial Code (4th Ed. 1995) § 3-5, p. 128; see also General Statutes § 42a-2-319; *Ranger, Inc.* v. *Gildersleeve*, 106 Conn. 372, 375, 138 A. 142 (1927) (under Sales Act, delivery of goods to carrier is delivery to buyer); *Lewis* v. *Scoville*, 94 Conn. 79, 87, 108 A. 501 (1919) (same); *Alderman Brothers Co.* v. *Westinghouse*

*Air Brake Co.*, 92 Conn. 419, 425, 103 A. 267 (1918) (same).

We are persuaded that the questions of whether delivery occurred and, if so, when it occurred under § 12-407 (3) should be determined according to these well settled commercial principles. We have, "on a number of occasions . . . looked to the [UCC] as a fruitful source of analogy." *New England Yacht Sales, Inc.* v. *Commissioner of Revenue Services*, 198 Conn. 624, 630, 504 A.2d 506 (1986); see id. (trial court properly looked to UCC and common law antecedents to determine when title to property passed for purposes of imposition of sales and use tax); 3A J. Sutherland, Statutory Construction (5th Ed. 1992) § 66.03 (commercial usage proper referent in interpreting tax laws). In the present case, commercial law principles provide specific guidance on the meaning of delivery and the place of delivery in the context of sales of goods. The act operates on such commercial transactions and with respect to such commercial parties who, it must be expected, rely on the conventional meaning and implications of delivery terms. Furthermore, the legislature is deemed to be aware of the settled meanings of terms in related areas of law when it enacts a statute. Cf. *Perkins* v. *Freedom of Information Commission*, 228 Conn. 158, 169–70, 635 A.2d 783 (1993). In the absence of compelling evidence to the contrary, we do not presume that the legislature intended to depart substantially from the accepted meaning attached to delivery in the commercial arena. Cf. *New England Yacht Sales, Inc.* v. *Commissioner of Revenue Services*, supra, 630 (relying on UCC rules for passage of title in sale of goods).

The commissioner argues, relying on certain letters issued by the department of revenue services that were introduced into evidence at trial, that his interpretation of § 12-407 (3) is longstanding and, therefore, is entitled to deference in interpreting the statute. See *Bridgeport*

*Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 109, 653 A.2d 782 (1995). The factual circumstances in the letters, however, are not identical with those at issue in this case. The letters, ranging from 1951 to 1978, are responses to inquiries regarding how the act would apply to particular situations. Several of the letters appear to involve drop shipment transactions in which goods were sent to a Connecticut location from a manufacturer's warehouse or plant located in Connecticut and, in others, the factual circumstances of the transactions in question are unclear. Moreover, the letters simply do not address the meaning of the term "deliver" or the place of delivery and, therefore, are not persuasive.[10]

The commissioner also appears to suggest that the purpose of the statute is to ensure the collection of taxes to the fullest extent and that employing commercial principles regarding place of delivery is contrary to this purpose because it would permit parties to avoid liability for tax under the act. We have noted, however, that "[u]nlike tax evasion, tax avoidance through careful planning of both transactions and corporate structure is a legitimate right of every taxpayer." (Internal quotation marks omitted.) *SFA Folio Collections, Inc.* v. *Bannon*, 217 Conn. 220, 234, 585 A.2d 666, cert. denied, 501 U.S. 1223, 111 S. Ct. 2839, 115 L. Ed. 2d 1008 (1991). Further, any ambiguity in the coverage of the statute must be construed in favor of the taxpayer, which supports our reliance on the narrower, commonly accepted commercial notions of delivery and place of delivery.

The remaining question to be addressed, then, is whether Steelcase delivered its products in Connecti-

---

[10] Additionally, because this case involves a question of law on which we have not spoken directly, the agency's interpretation is not entitled to our usual deference. See *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995); *Dept. of Administrative Services* v. *Employees' Review Board*, 226 Conn. 670, 679, 628 A.2d 957 (1993).

cut. Although the trial court did not decide this issue, the stipulated facts provide a sufficient factual basis for us to resolve this issue. Notably, the commissioner does not dispute the sufficiency of the factual record in this regard.

Steelcase's terms and conditions of sale in the five transactions at issue provided that delivery was to be "F.O.B. factory." It is widely accepted that this delivery term means that delivery takes place when the seller places the goods into the possession of a common carrier at the seller's place of business. Thus, under the terms of Steelcase's sales contracts, delivery took place at its plant in Michigan, where Steelcase placed the goods in the possession of a common carrier. Accordingly, Steelcase did not deliver the goods in this state and, therefore, did not make a retail sale within the meaning of § 12-407 (3).

The judgment is affirmed.

In this opinion the other justices concurred.